WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pinnacle Pines Community Association,<br><br>Plaintiff,<br><br>v.<br><br>Everest National Insurance Company,<br>Chartis Specialty Insurance Company,<br><br>Defendants. | No. CV-12-08202-PCT-DGC<br><br>**ORDER** |

Defendants Everest National Insurance Company ("Everest") and Chartis Specialty Insurance Company ("Chartis") have each filed a motion for summary judgment. Doc. 115, 117. Plaintiff Pinnacle Pines Community Association ("Pinnacle Pines") has filed motions for summary judgment against Everest (Doc. 119) and Chartis (Doc. 120). Chartis has also filed a motion to strike Plaintiff's rebuttal expert, which Everest has joined. Doc. 124. All motions have been fully briefed. For the reasons that follow, the Court will grant summary judgment for Defendants.[1]

**I.    Background.**

Plaintiff is a homeowner's association "comprised of members who own one or more of the duplexes located in Pinnacle Pines, a 60 unit duplex community in Flagstaff, Arizona." Doc. 119 at 3. Pinnacle Pines was constructed and sold by Empire Residential

---

[1] Defendants' requests for oral argument are denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

1  Construction, L.P. and Empire Residential Sales, L.P. ("Empire" or the "Empire
2  entities") between 2006 and 2008. *Id.* Shortly after construction ceased in 2008,
3  problems began to arise, including "drainage issues, driveway defects and significant
4  roof, deck, and door leaks." *Id.* These construction defects caused mold and mildew
5  damage in several of the duplexes, leaky sliding glass doors, "rampant" wood rot,
6  cracking and uneven walkways, and driveways that become icy and dangerous during the
7  winter due to improper drainage. *Id.* Plaintiff alleges that all units and common areas
8  were damaged as a result of Empire's defective construction, and "elected to pursue
9  Empire for property damage[.]" *Id.* at 4. The Empire entities filed for bankruptcy
10 protection in April 2008. *Id.* Plaintiff obtained relief from the automatic stay and served
11 notice of the defects on Empire in February 2010. *Id.* In its order lifting the automatic
12 stay, "the bankruptcy court approved an assignment to [Plaintiff] of all coverage rights
13 Empire may have against any insurance carriers arising out of the Pinnacle Pines
14 construction defect claims." *Id.*

15 Plaintiff and Empire then arbitrated the construction defect claims, resulting in an
16 award of $1,371,220.33 in favor of Plaintiff and against Empire. *Id.* at 5. The award
17 consisted of $920,521 in compensatory damages, $276,156.30 in attorneys' fees,
18 $165,000 in expert witness fees, and $9,543.03 for arbitration costs. *Id.* The Coconino
19 County Superior Court entered judgment on September 11, 2013, confirming the
20 arbitration award. *Id.* Plaintiff filed this action to collect on the judgment against
21 Defendants, Empire's excess insurers. *Id.* Both Everest and Chartis contend that they are
22 not required to pay any portion of the arbitration award.

23 **A.  The Everest Policy.**

24 The Everest Policy is a "commercial excess liability policy" that covers "the
25 ultimate net loss in excess of the 'underlying limits of insurance' to which [the Everest
26 Policy] applies." Doc. 115 at 5. The underlying insurance policy was a "wrap policy"
27 issued by Lexington Insurance Company. *Id.* at 4. The Lexington wrap policy ("LWP")
28 was effective from May 31, 2007 to June 30, 2008. *Id.* The Everest Policy "follows the

terms, definitions, conditions, and exclusions that are contained" in the LWP, and Everest alleges that the coverage under its policy "will not be broader than the coverage provided by the [LWP]." *Id.* at 5. The terms of the LWP state that it "applies to 'bodily injury' and 'property damage' which is not included in the 'products-completed operations hazard' only if: (1) the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and (2) the 'bodily injury' or 'property damage' occurs during the policy period." Doc. 116-1 at 43. The LWP is subject to a $250,000 self-insured retention. Doc. 115 at 5. Its $5,000,000 coverage limits have been exhausted. *Id.*; Doc. 119 at 7.

**B.     The Chartis Policy.**

The Chartis Policy is a commercial umbrella policy which was effective from June 1, 2004 through June 1, 2007. Doc. 117 at 3. Chartis alleges that its policy provides for a "Retained Limit of $1 Million per Occurrence." *Id.* at 3. The Chartis Policy defines "occurrence" with respect to bodily injury or property damage as "an accident, including continuous or repeated exposure to conditions," resulting in bodily injury or property damage as defined by the policy that is "neither expected nor intended from the standpoint of the Insured." *Id.*, Doc. 118-3 at 7. "Property Damage" is defined as: (1) "physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or" (2) "Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the Occurrence that caused it." Doc. 117 at 3, Doc. 118-3 at 8.

The Chartis Policy excludes "Property Damage" arising out of "[a] defect, deficiency, inadequacy, or dangerous condition in" the insured's product or work as defined by the policy. Doc. 117 at 4, Doc. 118-3 at 9. The Chartis Policy defines "Products-Completed Operations Hazard" as all "Bodily Injury" and "Property Damage" "occurring away from premises" owned or rented by the insured and "arising out of" the insured's product or work, excluding products that are still in the physical possession of

the insured, and "work that has not yet been completed or abandoned."  Doc. 118-3 at 8, Doc. 120 at 6.  Work is completed under the policy "when all work called for in [the insured's] contract has been completed," "when all of the work to be done at the site has been completed if [the] contract calls for work at more than one site," and "when that part of the work done at a job site has been put to its intended use by any person or organization other than another contactor or subcontractor working on the same project."  Doc. 118-3 at 8, Doc. 120 at 6.

## II.     Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion."  *Keggi v. Northbrook Prop. and Cas. Ins. Co.*, 13 P.3d 785, 788 (Ariz. Ct. App. 2000) (citation omitted).  In interpreting an insurance contract, courts "give words their ordinary, common sense meaning," and view language used "from the standpoint of the average layman who is untrained in the law or insurance."  *Aztar Corp. v. U.S. Fire Ins. Co.*, 224 P.3d 960, 966 (Ariz. Ct. App. 2010) (citations omitted).  An insurance policy must also "be construed according to the entirety of its terms and conditions as set forth in the policy."  A.R.S. § 20-1119.  If a clause appears ambiguous, courts interpret it "by looking to legislative goals, social policy, and the transaction as a whole."  *First Am. Title*

*Ins. Co. v. Action Acquisitions, LLC*, 187 P.3d 1107, 1110 (Ariz. 2008).

**III.     Analysis.**

    **A.     Everest Policy.**

        **1.     Reservation of Rights.**

Plaintiff argues that Everest should be estopped from contesting coverage because it failed to send a reservation of rights letter. Doc. 134 at 14-15. Everest responds that it was not required to send such a letter. Doc. 138 at 10. As support for its position, Plaintiff cites *Farmers Insurance Company of Arizona v. Vagnozzi*, 675 P.2d 703, 706 (Ariz. 1983), which it argues binds Everest to the result of the underlying arbitration. Doc. 134 at 14-15. *Vagnozzi*, however, actually supports Everest's position. *Vagnozzi* recognized that when an "insurance company refused to defend an action under circumstances where it has a duty to defend, it is bound under the doctrine of collateral estoppel by the facts determined," but noted that a "party will not be precluded from litigating policy coverage in a subsequent proceeding if the question of coverage turns on facts which are nonessential to the judgment of tort liability[.]" 675 P.2d at 705 (citing *Fuller v. Hartford Accident & Indem. Co.*, 601 P.2d 1360 (Ariz. Ct. App. 1979)). Assuming without deciding that Everest would be bound by the facts litigated in the underlying arbitration, it is not estopped from litigating policy coverage issues that were not addressed in the arbitration. Because the coverage issues in this case turn largely on facts that were not determined in the arbitration, the Court concludes that Everest was not required to send a reservation of rights letter in order to preserve its ability to litigate coverage.

        **2.     Self-Insured Retention.**

Everest contends that the LWP is subject to a $250,000 self-insured retention ("SIR") for each occurrence and that Plaintiff has not provided evidence that Empire satisfied the SIR in this case. Doc. 115 at 8. Plaintiff counters that an unsatisfied SIR is a policy exclusion that must be established by the insurer. Doc. 134 at 5 (citing *Venissat v. St. Paul Fire & Marine Co.*, 968 So.2d 1063, 1074 (La. App. 3 Cir. 2007)).

1    The parties cite no Arizona authority on whether the insurer or the insured bears the burden of proving a SIR has been satisfied, and the Court has been unable to locate any such authority.  The *Venissat* case cited by Plaintiff is unconvincing because it cites a Louisiana standard holding that the insurer bears the burden of establishing any policy *limits* or exclusions.  968 So.2d at 1074.  Arizona law imposes the burden on insurers to establish the applicability of *exclusions*.  *Keggi*, 13 P.3d at 788.  The question, then, is whether the SIR can be considered a policy exclusion.

Plaintiff cites no support for its assertion that the SIR is an exclusion under the LWP, and the language of the LWP suggests that it is not.  Section I.A of the LWP describes the policy's coverage for property damage and section I.A.2 sets forth exclusions from that coverage.  Doc. 116-1 at 45.  The exclusions describe specific risks not covered, such as those arising from intentional injury, liquor liability, pollution, and war.  *Id.* at 45-54.  The SIR is not listed among the exclusions.  *Id.*  Instead, the SIR is listed later in the policy as one of the "Conditions Precedent to Coverage."  *Id.* at 71.  Specifically, the policy states that, "[a]s [a] condition[] precedent to coverage," the insured must "[p]ay any amounts due or owed under the Retained Amount."  *Id.*  Given this clear language and the absence of an Arizona policy to the contrary, the Court cannot conclude that the SIR is an exclusion that must be established by the insurer.

Plaintiff argues that the insurance coverage remains in place even if Empire did not satisfy the SIR, and that the amount of the SIR can simply be offset against the judgment.  Doc. 134 at 5.  As support, Plaintiff cites *Anderson v. Everest Nat. Ins. Co.*, -- F. Supp. 2d --, 2013 WL 6179419, at *5 (D. Ariz. Nov. 26, 2013), but *Anderson* did not hold that an unsatisfied SIR could be offset against a judgment.  Rather, *Anderson* denied a motion to dismiss because the plaintiffs "allege[d] in their complaint that the underlying insurance is exhausted" and factual issues precluded granting of the motion to dismiss.  *Id.  Anderson* did not discuss the concept of offset.

Plaintiff also argues that courts in other jurisdictions have held that "it would offend public policy to permit an insurer to avoid its obligations for a judgment in excess

of the SIR when an insured cannot satisfy the SIR due to bankruptcy." Doc. 134 at 6 (citing cases). In each of Plaintiff's cited cases, however, the courts considered the state's public policy or statute prohibiting an insurer from refusing to pay where the insured could not satisfy the SIR due to bankruptcy or insolvency. *See Rosciti v. Ins. Co. of Pa*, 659 F.3d 92, 97-98 (1st Cir. 2011) (considering Rhode Island's public policy "to prevent insurance companies from avoiding their obligations when an insolvent insured cannot make an expenditure towards discharging liability"); *Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 255 (5th Cir. 1988) (discussing a Louisiana statute which provides that "the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages"); *Home Ins. Co. of Ill. v. Hooper*, 691 N.E.2d 65, 70 (Ill. Ct. App. 1998) (discussing an Illinois statute which guaranteed "that the insolvency or bankruptcy of the insured will not release the insurer from payment of damages"); *In re Federal Press Co.*, 104 B.R. 56, 62 (Bankr. N.D. Ind. 1989) (considering an Indiana statute requiring "insurance policies issued in Indiana to contain a provision preventing the insolvency or bankruptcy of the insured from releasing the insurance carrier from liability under the policy").

Plaintiff has not identified – and the Court has not found – such a statute or public policy in Arizona. In the absence of Arizona law or policy prohibiting an insurer from refusing to pay where an insured is unable to satisfy a policy's SIR due to bankruptcy or insolvency, the Court must apply the LWP and Everest Policy by looking to the "ordinary, common sense meaning" of the policy language. *See Aztar Corp.*, 224 P.3d at 966; *see also Pak-Mor Mfg. Co. v. Royal Surplus Lines Ins. Co.*, No. SA-05-CA-135-RF, 2005 WL 3487723, at *5-*6 (W.D. Tex. Nov. 3, 2005) (distinguishing *Hooper* and *Albany Insurance Company* and interpreting an insurance policy based on "the plain meaning of the words" because "[u]nder Texas law, insurers are free to issue policies that relieve them of liability in the bankruptcy context").

The LWP contains a bankruptcy provision: "The bankruptcy or insolvency of you or your estate will not relieve us of our obligations under this policy." Doc. 116-1 at 67.

The LWP defines "you" as the "Named Insured" (*id.* at 16), which in this case is Empire (*id*. at 4, 15). Thus, the LWP and the Everest Policy specifically provide that the insolvency of Empire does not relieve Everest of its insurance obligation.

The bankruptcy provision further states that "[i]n the event there is insurance, whether or not applicable to an 'occurrence', offense, claim, or 'suit' within the Retained Amount, you [Empire] will continue to be responsible for the full amount of the Retained Amount before the Limits of Insurance under this policy apply." *Id*. at 67. This provision suggests that Empire remains responsible for the full amount of the SIR even if it becomes bankrupt, but only "[i]n the event there is insurance." The "insurance" referred to in this sentence is not specified, but the following clause – "whether or not applicable to an 'occurrence', offense, claim, or 'suit' within the Retained Amount" – suggests that it is insurance related to the Retained Amount, the SIR. Because the sentence provides that the insured remains responsible for the full amount of the SIR regardless of bankruptcy only "[i]n the event" there is such insurance, the Court cannot accept Everest's argument that the insured remains responsible for the SIR in all events, even when there is no insurance that would cover the SIR. Such a reading would mean that Everest can escape liability under the policy if the insured is unable to pay the SIR due to bankruptcy, a result clearly inconsistent with the first sentence of the bankruptcy provision. Because the parties do not suggest that Empire had insurance coverage for the SIR in this case, this sentence provides no escape hatch for Everest.

The bankruptcy provision also states that the insured's inability to pay the SIR will not increase the insurer's obligation under the policy. *Id.* The Court reads this provision to mean that the insurer cannot be required to pay the amount otherwise within the SIR; the insurer's obligation applies only to losses in excess of the SIR. This provision would suggest that the amount of the SIR, if not paid, should be offset against any recovery from Everest to ensure that Everest's obligations under the policy are not increased.

Given the language of the bankruptcy provision, the Court concludes that the bankruptcy of Empire and Empire's resulting inability to pay the SIR do not absolve

1    Everest from its responsibility to provide insurance coverage. The Court therefore
2    declines to grant summary judgment for Everest for nonpayment of the SIR.

### 3. Existence of Coverage.

Everest next argues that Plaintiff must prove the existence of property damage caused by an "occurrence" that took place in the "coverage territory," which arose out of work performed on a designated project during the policy period, and that the "property damage" occurred after the inception of the policy and prior to the time within which Plaintiff can bring suit under the policy. Doc. 115 at 8-9. Everest contends that Plaintiff has failed to do so because construction at Pinnacle Pines began in 2006, but the LWP and Everest Policy did not come into force until May 31, 2007. *Id.* at 9. Plaintiff responds that the relevant date for coverage is the date that a plaintiff sustains actual damage, and argues that insurers must provide coverage for damage that occurs during the policy period even if it was preceded by other similar damage. Doc. 134 at 7 (citing *Lennar Corp. v. Auto-Owners Ins. Co.*, 151 P.3d 538, 548 (Ariz. Ct. App. 2007)). It argues that the "evidence unequivocally proves property damage manifested during the coverage period, after the expiration of the policy, or after the date of the close of escrow," and that coverage under the Everest Policy is therefore triggered. *Id.*

The LWP provides, with regard to individual units of construction, that property damage included in the products-completed operations hazard is covered if all of the following conditions are met: (1) the property damage is caused by an occurrence that takes place in the coverage territory; (2) the property damage arises out of a construction defect attributable to work performed on the designated project during the policy period; and (3) the construction defect manifests "on or after the expiration of this policy or the date of close of escrow of the individual unit, whichever occurs first," but prior to the time within which a claimant can bring suit or prior to ten years after the expiration of this policy or close of escrow, whichever occurs first. Doc. 116-1 at 44. Coverage requirements for property damage to common areas are similar. *Id.*

The Everest Policy expired in May 2008, less than ten years ago. Everest does not

- 9 -

contend that the "time within which a claimant can bring 'suit'" has expired. Plaintiff has alleged the existence of property damage to both individual units and common areas that occurred within ten years of the expiration of the policy and prior to the expiration of the statute of limitations for construction defect claims.

The existence of coverage, then, turns on whether Plaintiff can show that the alleged property damage arises out of a construction defect attributable to work performed on the project during the policy period. Doc. 116-1 at 44. On this point, Plaintiff presents the inspection record for Lot 3, which appears to show that various inspections were conducted at Lot 3 after July 27, 2007. Doc. 121-3 at 2. Plaintiff also filed a supplement to its statement of facts which included the inspection records for twelve additional lots. Doc. 144-2. Of these inspection records, only ten lots, namely Lots 11, 12, 13, 14, 22, 23, 81, 82, 83 and 84, had any inspections conducted after May 31, 2007, the effective date of the policy. Doc. 144-2 at 2-7, 10-13. Plaintiff then presents a "Defect List and Repair Recommendations" which catalogs construction defects noted at various individual units at Pinnacle Pines. *See* Doc. 121-1. Of the eleven lots for which Plaintiff has presented an inspection record showing that at least one inspection occurred during the policy period, only six were noted to have construction defects: Lots 3, 12, 13, 14, 81, and 82.[2]

Although Plaintiff contends generally that Pinnacle Pines was constructed between 2006 and 2008, the inspection records for these six lots, without more, are not evidence that work was performed on these units during the LWP and Everest Policy periods. The inspection records are evidence of the dates on which inspections were performed, but they do not show when work was performed. Plaintiff has presented no other evidence from which a trier of fact could determine when work on these six allegedly defective units was actually performed. The "Defect List and Repair Recommendations" catalogs

---

[2] *See* Lot 3 (Doc. 121-1 at 5, 17, 23, 26, 28, 31, 50, 51); Lot 12 (*id.* at 14, 17, 20, 23, 26, 42, 49, 50); Lot 13 (*id.* at 5, 6, 11, 14, 17, 20, 23, 26, 28, 31, 42, 46, 47, 48, 50, 51); Lot 14 (*id.* at 5, 6, 17, 20, 23, 26, 34, 37, 40, 42, 45, 46, 48, 52); Lot 81 (*id.* at 5, 6, 17, 23, 26, 28, 52); and Lot 82 (*id.* at 5, 6, 17, 20, 23, 26, 28, 31, 49, 50, 52).

- 10 -

construction defects at various units, but contains no information as to when work on the units was performed. *See* Doc. 121-1. Plaintiff also submits a "Preliminary Forensic Geotechnical Investigation" which catalogs damage and defects involving driveways, sidewalks, and roads (Doc. 121-2), but this document contains no information about when work on the driveways, sidewalks, and roads was actually performed. Plaintiff's statement of facts cites frequently to its arbitration brief (Doc. 116-1 at 185-203) as evidence of property damage, but Plaintiff has not submitted any of the exhibits referenced in its arbitration brief and Plaintiff's arbitration brief is not evidence that work was performed during the policy period. Plaintiff also presents a spreadsheet purporting to show the dates that warranty deeds were recorded for various units at Pinnacle Pines (Doc. 121-4), but this spreadsheet contains the dates that deeds were recorded and does not show when work was performed on any of the allegedly defective units.

Plaintiff purports to set forth Lot 45 as an "example of the issues plaguing Pinnacle Pines" (Doc. 121, ¶ 47), and submits the purchase agreement for Lot 45 (Doc. 121-6). Plaintiff admits, however, that the roof on Lot 45 was constructed between January 1, 2006 and December 27, 2006 – outside the relevant policy period. *Id.* This is also not evidence that any work was performed during the policy period. Additionally, Plaintiff's supplemental statement of facts includes a "Report on Job Site Conditions" dated August 29, 2006 (Doc. 144-1 at 2), but this is not evidence that any work was performed during the policy period.

The only other evidence presented by Plaintiff, aside from the insurance policies themselves, is a rebuttal expert report. Doc. 136-1.[3] This report, however, is largely an opinion as to the exposure of Empire's insurance carriers for property damage at Pinnacle Pines and contains nothing from which a trier of fact could determine when work was performed on any of the defective units.

---

[3] The Court notes that Defendants have filed a motion to strike Plaintiff's rebuttal expert report. Doc. 124. The Court concludes that it need not decide the motion to strike because, in any event, the expert report contains no evidence that would preclude the entry of summary judgment.

- 11 -

1    In sum, Plaintiff has presented no evidence from which a reasonable jury could conclude that work on these allegedly damaged units was performed during the Everest Policy period. Plaintiff likewise has not produced evidence that work on any common areas was performed during the Everest Policy period.

Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Because Plaintiff has failed to produce evidence that any of its alleged property damage is attributable to construction defects arising out of work performed during the policy period, which is an essential element of its case, the Court will enter summary judgment in favor of Everest with respect to all portions of the Pinnacle Pines development.

**B.    The Chartis Policy.**

**1.    Applicability of Retained Limit.**

Chartis contends that it is entitled to summary judgment because Plaintiff has presented no evidence that its $1 million retained limit has been satisfied. Doc. 117 at 6. Plaintiff argues that the retained limit does not apply to Pinnacle Pines. Doc. 135 at 5-6.

The $1 million retained limit appears on the final page of the "Retained Limit Amendatory Endorsement," which is Endorsement 10 of the Chartis Policy. Doc. 121-7 at 30-33. The first page of the endorsement states that "[w]e will be liable only for that portion of damages in excess of the limits in the Schedule of Retained Limits[.]" *Id.* at 30. The "Schedule of Retained Limits" appears on the fourth page of the endorsement. It begins by listing a $1 million retained limit for "Each and Every Occurrence" for "General Liability" and "Products/Completed Operations Self Insured Retention." *Id.* at 33. The Schedule then states, twice, that: "THE FOLLOWING RETENTION APPLIES TO THE FOLLOWING PROJECT(S) ONLY," and lists several Empire projects not including Pinnacle Pines. *Id.* Both of these additional sections specifies that defense costs do not erode the retained limit, and one includes retained limits of $1 million for each occurrence and $1 million for each accident and each employee policy limit. *Id.*

1    Plaintiff argues that the retained limit does not apply in this case because Pinnacle Pines is not listed in the Schedule. Chartis argues that Plaintiff's interpretation ignores the meaning of the word "following." Doc. 132 at 11. Chartis asserts that the General Liability retained limit of $1 million appears at the outset of the Schedule and the lists of properties appear only after references to "the following retention," which cannot include the preceding retention. *Id.* at 11-13.

The Court agrees with Chartis. The Schedule begins with a $1 million retention that is not limited to any particular properties. Doc. 121-7 at 33. The Schedule then states that the "following" retention applies to the "following" properties, and lists several properties, with some additional information regarding their retentions – that defense costs do not erode retained limits and some additional retained limits that apply to each accident and each employee. *Id.* The Court cannot conclude that the initial retained limit of $1 million is somehow limited because the Schedule later refers to other retained limits and properties that "follow." The Court concludes that the $1 million retained limit applies to the "General Liability" and "Products/Completed Operations" covered by the insurance policy, including Plaintiff's coverage.[4]

### 2. Property Damage.

Chartis argues that Plaintiff bears the "burden of establishing that there is more than at least $1 Million in Property Damage that took place between June 1, 2004 and June 1, 2007." Doc. 117 at 6. As noted above, the Chartis policy provides that "[w]e will be liable only for that portion of damages in excess of the limits in the Schedule of Retained Limits[.]" Doc. 121-7 at 30. Elsewhere, the policy provides that Chartis "will pay on behalf of the [i]nsured those sums in excess of the Retained Limit that the [i]nsured becomes legally obligated to pay by reason of liability imposed by law or

---

[4] The Court agrees that the Schedule is not entirely clear. The first reference to a "following retention" identifies no new or different retention. It does state that defense costs do not erode the retention, language that does not appear in the retained limit at the start of the Schedule, but the absence of an actual new retained limit amount is somewhat confusing. This ambiguity, however, concerns the terms of "the following retention," not the retained limit set forth at the beginning of the Schedule. Under no circumstances can the Court conclude that the word "following" really means "preceding."

- 13 -

assumed by the [i]nsured under an Insured Contract because of . . . Property Damage[.]" Doc. 120 at 5. Thus, even if Chartis is liable to Plaintiff under the policy, it is liable only for property damage incurred by Plaintiff in excess of $1 million.

Plaintiff asserts that the Chartis policy covers "Property Damage" (Doc. 120 at 5-6, 8-9), and that the Court "needn't relitigate issues previously adjudicated in a binding arbitration" (Doc. 120 at 8). But the fact that Plaintiff received an arbitration award of $1,371,220.33 does not establish that the entire amount constituted property damage under the Chartis Policy. To the contrary, Plaintiff acknowledges that the award includes $920,521.00 in compensatory damages, $276,156.30 in attorneys' fees, $165,000 in expert witness fees, and $9,543.03 for reimbursement of costs. *Id.* at 5. Although Plaintiff does request attorneys' fees for its litigation expenses in this case, those fees would be recoverable under Arizona law only if Plaintiff prevails in establishing that Chartis is liable to it for property damage. *See* A.R.S. § 12-341.

Plaintiff does not contend that Chartis would be responsible under the terms of its policy for paying the attorneys' fees, expert witness fees, or costs incurred in the underlying arbitration, but rather cites to *Desert Mountain Properties Limited Partnership v. Liberty Mutual Fire Insurance*, 236 P.3d 421, 436-37 (Ariz. Ct. App. 2010), for the proposition that it is entitled to fees and costs from the arbitration. Doc. 120 at 13. In *Desert Mountain*, the court awarded fees based on the principle that "when one party's breach of contract places the other in a situation that 'makes it necessary to incur expense to protect his interest, such costs and expenses, including attorneys' fees should be treated as the legal consequences of the original wrongful act and may be recovered as damages.'" 236 P.3d at 436 (quoting *Fairway Builders Inc. v. Malouf Towers Rental Co.*, 603 P.2d 513, 529 (Ariz. Ct. App. 1979)). The underlying arbitration dealt with the liability of the Empire entities for construction defects and did not concern a breach of contract by Chartis. This authority is therefore not applicable. Without the arbitration-related fees and expenses, the maximum portion of the arbitration award that could include covered property damage would be the $920,521.00 in

compensatory damages, which is less than the Chartis Policy's $1 million retained limit. Plaintiff thus has presented no evidence from which a trier of fact could conclude that Chartis is liable to Plaintiff for property damage under the policy.

Finally, although Plaintiff does not contend that Chartis failed to send a reservation of rights letter, it does argue that Chartis "should be barred from denying coverage because it is not entitled to contest the factual or legal basis for the underlying Judgment in which it participated." Doc. 143 at 8. As discussed above, however, an insurer is not precluded from litigating policy coverage if that question turns on facts which were not determined in the prior action. *See Vagnozzi*, 675 P.2d at 705. Plaintiff has presented no evidence that the applicability of the Retained Limit of the Chartis Policy was litigated in the underlying arbitration. The Court will therefore grant summary judgment for Chartis.

**IT IS ORDERED** that Defendants' motions for summary judgment (Docs. 115, 117) are **granted**. Plaintiff's motions for summary judgment (Docs. 119, 120) are **denied**. Defendant's motion to strike (Doc. 124) is **denied as moot**. The Clerk is directed to terminate this action.

Dated this 9th day of May, 2014.

_____
David G. Campbell
United States District Judge